[Cite as *State v. Holmes*, 2018-Ohio-2086.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

STATE OF OHIO, :

    Plaintiff-Appellee, : CASE NO. CA2017-08-115

: O P I N I O N
- vs - 5/29/2018

:

DONALD HOLMES, :

    Defendant-Appellant. :

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2016-12-1840

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Scott N. Blauvelt, 315 South Monument Avenue, Hamilton, Ohio 45011, for defendant-appellant

**HENDRICKSON, P.J.**

{¶ 1} Defendant-appellant, Donald Holmes, appeals his convictions in the Butler County Court of Common Pleas for rape and gross sexual imposition. For the reasons described below, this court affirms Holmes' convictions.

{¶ 2} A Butler County grand jury indicted Holmes on one count of rape, a violation of R.C. 2907.02(A)(1)(b), a first-degree felony, and one count of gross sexual imposition, a

violation of R.C. 2907.05(A)(4), a third-degree felony. The indictments stemmed from allegations that Holmes raped F., his 12-year-old relative.

{¶ 3} The matter proceeded to a jury trial. F. testified that she lived in the Toledo area with her grandparents and older sister. In the summer of 2016, F. and two younger stepbrothers stayed briefly at the Hamilton, Ohio home of their Aunt Crystal and her husband, Holmes.

{¶ 4} The evening after the children arrived in Hamilton, Crystal – who worked overnight – went to work and left Holmes to watch the children. Late that evening, Holmes provided the children with drinks and they played a game called "quarters." F. testified that her drink smelled "weird" and tasted "gritty" and that she felt disoriented.

{¶ 5} Sometime after midnight, F. laid in her bed in the basement. Holmes laid beside her and began touching her breasts and kissing her neck. F. "didn't think it was okay" and went upstairs. Holmes followed her into a hallway, picked her up by her hips, carried her into his bedroom, and placed her on the bed.

{¶ 6} Holmes took off most of F.'s clothes. He kissed her belly, hips, and vagina. He then had sexual intercourse with F. F. thought Holmes used a condom. F. described feeling limp and in a state of shock during this event. A nurse testified that young rape victims often describe an inability to fight back or the sensation of their body shutting down during the assault.

{¶ 7} Afterwards, Holmes went to the bathroom. F., who did not have her own cell phone, took Holmes' phone off his dresser and went downstairs to the basement. F. said that she composed a lengthy text message to her Aunt Crystal about what had just occurred but it failed to send.

{¶ 8} Holmes confronted F. about what she was doing with his phone. F. then went upstairs and entered the bathroom. She jumped out of the bathroom window and ran to a

neighbor's house.

{¶ 9}   The neighbor testified that at approximately 3:00 a.m. she received a knock at her door and heard a young female voice asking to be let in and saying that she had been raped.  The neighbor would not open the door but said that she would call the police.

{¶ 10}   However, the neighbor turned off the porch light and F. left before police arrived.  F. tried to find another neighbor's house to go to and later saw Holmes leaving his residence in a vehicle to search for her.

{¶ 11}   F. then went back into the home, intending to wake her brothers and tell them police were en route.  Meanwhile, Holmes returned to the residence.  F. hid but Holmes found her, told her he would not hurt her, and allowed her to use his cell phone to place a call to Crystal.  Because Holmes was nearby, F. did not tell her aunt what occurred but said she would inform her in person.

{¶ 12}   F. gathered some belongings and left the home again, this time going to a different house where a neighbor allowed her to remain in the garage and wait for Crystal to come home from work.

{¶ 13}   After Crystal came home several hours later, F. spoke with Crystal, who recorded the conversation on her phone.  F. was extremely emotional during the conversation and eventually revealed to her aunt that Holmes had sex with her.  She also stated that Holmes told her he was having dreams of having sex with her and her older sister.

{¶ 14}   Crystal drove F. back to Toledo, where a grandparent took her to a hospital for a sexual assault examination approximately 12 hours after the assault.  A nurse drew blood for a toxicology screen and swabbed F.'s vagina, anus, neck, hip, and stomach for a rape evidence kit.   The toxicology screen was negative for alcohol or date-rape drugs. Investigators sent the rape kit to a crime laboratory where forensic scientists compared the collected samples to Holmes' DNA profile.  A scientist found that the DNA on the anal and

neck swabs was comparable to Holmes' DNA profile.

{¶ 15} Holmes testified in his own defense and claimed that F. was angry with him because he would not let her use his phone. As he was watching television, F. secretly took the phone from his bedroom. Holmes realized that the phone was missing, found F., and recovered his phone. He saw that F. had attempted to text Crystal a message alleging that he touched her. He began yelling at F. and she fled to the bathroom and left the home through the window.

{¶ 16} The jury found Holmes guilty and the court sentenced him to ten years to life in prison. Holmes raises two assignments of error in this appeal.

{¶ 17} Assignment of Error No. 1:

{¶ 18} APPELLANT WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.

{¶ 19} Holmes argues that the state violated his right to a fair trial by asking the jurors to "give justice" to F. during closing argument and by playing the portion of the recorded conversation where F. claimed that Holmes said he dreamt of having sex with F. and her older sister. Holmes concedes that he did not object to either of these claimed instances of error. However, Holmes argues that plain error exists because the state's case against him was weak and that either of the errors could have affected the outcome of the trial.

{¶ 20} For a conviction to be reversed because of prosecutorial misconduct, a defendant must prove the prosecutor's acts were improper and that they prejudicially affected the defendant's substantial rights. *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, ¶ 62. To demonstrate prejudice, a defendant must show that the improper acts were so prejudicial that the outcome of the trial would clearly have been otherwise had they not occurred. *State v. Jones*, 12th Dist. Butler No. CA2006-11-298, 2008-Ohio-865, ¶ 21.

{¶ 21} The focus of "an inquiry into allegations of prosecutorial misconduct is upon

the fairness of the trial, not upon the culpability of the prosecutor." *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 57. As such, prosecutorial misconduct "is not grounds for error unless the defendant has been denied a fair trial." *State v. Olvera-Guillen*, 12th Dist. Butler No. CA2007-05-118, 2008-Ohio-5416, ¶ 27.

{¶ 22} Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error means an obvious defect in trial proceedings that affected the defendant's substantial rights. *State v. Knodel*, 12th Dist. Butler No. CA2006-06-156, 2007-Ohio-4536, ¶ 15. Notice of plain error is taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Grisham*, 12th Dist. Warren No. CA2013-12-118, 2014-Ohio-3558, ¶ 38.

### Call for Justice

{¶ 23} Holmes argues that the state committed prosecutorial misconduct where, during closing argument, the prosecutor asked the jurors to give F. "justice." Holmes contends that this was an improper appeal to the jurors' emotions and a "Golden Rule" argument i.e., an argument asking the jurors to imagine themselves in F.'s place. The state counters that the "give justice" comment did not ask the jurors to imagine themselves in F.'s place and that calls for justice are not improper.

{¶ 24} Generally, a "Golden Rule" argument occurs when a prosecutor asks the jury to abandon impartiality and imagine themselves in the position of one of the parties. *State v. Tucker*, 12th Dist. Butler No. CA2010-10-263, 2012-Ohio-139, ¶ 44. As it relates to a criminal case, a "Golden Rule" argument could also involve a request by the prosecutor that the jury treat the defendant as the defendant treated his victim. Such arguments, while generally prohibited, are not per se prejudicial so as to require a new trial. Instead, the test is whether such an argument prejudicially affected the defendant's substantial rights. *Id.*

{¶ 25} Holmes challenges the following statement by the prosecutor at the conclusion of the state's initial closing argument:

> [F.] said it best. She's not going to remember every detail from a year ago, but she sat up on that witness stand, she reaffirmed that this happened to her and she wants her justice. Give [F.] justice. Hold that Defendant responsible for his actions. Find the Defendant guilty. Thank you.

{¶ 26} The prosecutor's remarks were not an improper "Golden Rule" argument as the prosecutor was not asking the jurors to imagine themselves in F.'s place. Additionally, the Ohio Supreme Court has held that there is nothing inherently improper in calling for justice for a victim. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 266 (noting that attorneys are granted a certain degree of creative latitude in closing arguments).

{¶ 27} Finally, the prosecutor's remarks were fair comment on the evidence presented at trial as it referenced a specific a portion of F.'s testimony on cross-examination:

> Defense counsel: Well, correct if I'm wrong, but you didn't have a choice but to be here, did you?
>
> F: No. Actually I did have a choice. I was actually considering not coming here because I didn't want to come and testify in front of him. I was afraid to come here. But no. I decided to stand up and do what I thought was right. Because I want my justice. I want my justice. And it looks like I'm not getting it very fast, and I'm not going to get it, obviously, because I got things wrong. And I'm sorry for that, but I can't remember.

{¶ 28} Thus, the remarks highlighted what the state perceived as an important portion of F.'s trial testimony. There is no error here, plain or otherwise, and no indication that the prosecutor's remarks denied Holmes a fair trial.

### Use of Recorded Statement

{¶ 29} Holmes argues that the prosecutor committed misconduct by publishing to the jury the portion of F.'s recorded conversation concerning Holmes' dream. Holmes argues that he and the state agreed to redact the dream statement. However, the statement was not redacted when played for the jury and the prosecutor later referenced the dream statement

briefly during closing argument. The state disputes that it agreed to redact the dream statement and that Holmes' counsel agreed that the statement could be admitted into evidence. The state further argues that the dream statement was otherwise admissible as the admission of a party-opponent under Evid.R. 801(D)(2).

{¶ 30} This court has scrutinized the record of relevant conversations between counsel and the court concerning the admission of the recording and the agreement to redact portions of the recording, including the dream statement. It appears that Holmes' counsel initially agreed that the dream statement would not be redacted. Later defense counsel stated that he wanted any reference to F.'s sister redacted, including the dream statement. However, after further discussion and a comment by the trial judge, defense counsel ultimately agreed that the dream statement need not be redacted specifically because F. was describing Holmes' own statement, i.e., an admission.

{¶ 31} Consequently, even if this court had concluded that admission of the dream statement was erroneous, any error would be invited. Under the invited error doctrine, which is applied when trial counsel is "actively responsible" for the trial court's alleged error, a party is not entitled to take advantage of an error that he himself invited or induced the trial court to make. *State v. Wesley*, 12th Dist. Butler No. CA2015-04-077, 2015-Ohio-5031, ¶ 26. Holmes therefore has not met his burden of demonstrating plain error and this court overrules his first assignment of error.

{¶ 32} Assignment of Error No. 2:

{¶ 33} APPELLANT WAS DENIED HIS RIGHT TO THE [EFFECTIVE] ASSISTANCE OF COUNSEL.

{¶ 34} In his second assignment of error, Holmes argues that trial counsel provided constitutionally deficient legal representation. Specifically, Holmes claims that counsel's alleged failure to object to the two claimed instances of prosecutorial misconduct prejudiced

him. Holmes argues that had counsel objected, the court might have provided curative instructions to the jury that would have mitigated any prejudicial impact of the misconduct and resulted in a different outcome at trial.

{¶ 35} To prevail on an ineffective assistance of counsel claim, Holmes must show his trial counsel's performance was deficient and that he was prejudiced as a result. *State v. Clarke*, 12th Dist. Butler No. CA2015-11-189, 2016-Ohio-7187, ¶ 49; *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S. Ct. 2052 (1984). Trial counsel's performance will not be deemed deficient unless it fell below an objective standard of reasonableness. *Strickland* at 688. To show prejudice, Holmes must establish that, but for his trial counsel's errors, there is a reasonable probability that the result of his trial would have been different. *Id.* at 694.

{¶ 36} The failure to satisfy either prong of the *Strickland* test is fatal to an ineffective assistance of counsel claim. *Clarke* at ¶ 49. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *State v. Burns*, 12th Dist. Clinton No. CA2013-10-019, 2014-Ohio-4625, ¶ 7.

{¶ 37} With respect to the "call for justice" argument, this court has already concluded that this remark was not improper and trial counsel's failure to object cannot be deficient in that respect. Regarding the dream statement, even if counsel had objected, the trial court may have found the statement relevant to the sexual gratification element of the gross sexual imposition claim and admissible under Evid.R. 801(D)(2)(a). Even if the lower court had sustained a hypothetical objection, this court would not find a reasonable probability of a changed outcome at trial.

{¶ 38} While Holmes characterizes the state's case against him as weak, this court has reviewed the trial record and disagrees. F., 13 years old at trial, testified that the

defendant touched her breast, buttocks, hips, and raped her vaginally with his penis. The state corroborated F.'s testimony with DNA evidence. The state's forensic scientist testified that male-specific DNA was present on the vaginal swab but not a sufficient amount for DNA testing. However, Holmes' DNA standard was consistent with a male-specific DNA profile found on the anal swab, which DNA profile would have been observed in 1 out of 833 persons. A DNA sample from the neck resulted in a second profile comparable to Holmes' DNA profile with a statistical frequency of 1 in 6,000. Finally, a third DNA profile found on a swab taken from F.'s hip resulted in a male-specific DNA profile comparable to Holmes that the scientist testified she would expect to see once in every 595 profiles.

{¶ 39} The jury had the ability to listen to F.'s testimony, observe her demeanor, and gauge her credibility. Holmes' defense counsel thoroughly and effectively cross-examined F. and drew out any inconsistencies in her testimony, which largely dealt with minor details irrelevant to the sexual assault. The jury also listened to Holmes' testimony, in which he testified that F. was a liar, that she always lied, and that she fabricated the story of rape because she was angry that he would not allow her to use his cell phone. Based on the evidence submitted at trial, the jury was free to believe F.'s testimony and disbelieve Holmes.

{¶ 40} Consequently, Holmes cannot demonstrate a reasonability probability of a changed outcome at trial but for his counsel's alleged failure to object to the dream statement. This court therefore overrules Holmes' second assignment of error.

{¶ 41} Judgment affirmed.

RINGLAND and M. POWELL, JJ., concur.